**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**EDDA FAYE FIELDS,**

      **Plaintiff,**

**vs.**                                                   **CIVIL ACTION NO. 3:16-CV-10284**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

      This is an action seeking review of the final decision of the Acting Commissioner of Social

Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II

of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered November 1, 2016 (Document

No. 3.), this case was referred to the undersigned United States Magistrate Judge to consider the

pleadings and evidence, and to submit proposed findings of fact and recommendations for

disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the

parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 9 and 10.)

      Having fully considered the record and the arguments of the parties, the undersigned

respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for

judgment on the pleadings (Document No. 9.), **GRANT** Defendant's request to affirm the decision

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

of the Commissioner (Document No. 10.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Edda Faye Fields (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on March 1, 2013, alleging disability since November 1, 2011 because of her "shoulder".[2] (Tr. at 271.) Her claim was initially denied on August 1, 2013 (Tr. at 107-111.) and again upon reconsideration on August 28, 2013. (Tr. at 115-121.) Thereafter, Claimant filed a written request for hearing on October 3, 2013. (Tr. at 122-123.) An administrative hearing was held on April 20, 2015 before the Honorable Robert M. Butler, Administrative Law Judge ("ALJ"). (Tr. at 27-85.) On April 24, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from November 1, 2011 through the date of the decision. (Tr. at 12-26.) On June 19, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 10-11.) The ALJ's decision became the final decision of the Commissioner on September 10, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 3-8.)

On October 31, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 6 and 7.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 9.); in response, the Commissioner filed a Brief in Support of

---

[2] In her Disability Report – Appeal, submitted on August 21, 2013, Claimant provided more information regarding her impairments: she injured her right shoulder on October 27, 2009, and reinjured it again on October 7, 2011; she also had filed a claim for a back injury in 1990 or 1991. (Tr. at 293.) Claimant further alleged that she has osteoporosis in her hips, bulging discs, sp[o]ndolyosis, fibromyalgia, and has trouble sleeping due to pain. (Tr. at 295.) In a subsequent Disability Report – Appeal, submitted on October 3, 2013, Claimant alleged that she was "[n]ow unable to lift arm above my shoulder. Unable to lift objects over five pounds." (Tr. at 299.)

Defendant's Decision. (Document No. 10.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 54 years old at the time of the ALJ's decision and considered a "person closely approaching advanced age" by the Regulations. See 20 C.F.R. § 404.1563(d). (Tr. at 34.) Claimant has a limited education; she did not complete the eleventh grade, and she did not obtain a GED. (Id.) In 2011, Claimant quit working at Wal-Mart because her shoulder and back do not allow her to do the type of work she had always done. (Tr. at 61.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant

work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2016. (Tr. at 17, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of November 1, 2011. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: cervical degenerative disc disease; thoracic strain; and chronic right shoulder strain. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform a range of light work:

> Specifically, the claimant is able to lift up to 20 pounds occasionally and ten pounds frequently. She is able to stand/walk for about six hours and sit for up to six hours in an eight-hour workday, with normal breaks. She is able to push and pull occasionally with her dominant right upper extremity. She is occasionally able to climb ladders/ropes/scaffolds, climb ramps/stairs, balance, stoop, kneel, crouch,

and crawl. She is able to reach overhead occasionally and frequently in all other directions with her dominant right upper extremity. She should avoid concentrated exposure to extreme cold, extreme heat, wetness, excessive vibration, unprotected heights, and use of moving machinery. (<u>Id</u>., Finding No. 5.)

At step four, the ALJ found Claimant was capable of performing her past relevant work as a cash accounting clerk and that this work did not require the performance of work-related activities precluded by her RFC. (Tr. at 21, Finding No. 6.) Finally, the ALJ determined Claimant had not been under a disability from November 1, 2011 through the date of the decision. (Tr. at 22, Finding No. 7.)

## **Claimant's Challenges to the Commissioner's Decision**

Claimant alleges three grounds in support of her argument that the ALJ's decision was not supported by substantial evidence: first, the ALJ improperly disregarded the findings of Claimant's treating physician, Dr. Donald A. Fisco, and instead gave greater weight to non-examining State agency medical consultants; second, the ALJ deviated from his duty to develop the record by failing to order a consultative orthopedic examination regarding Claimant's shoulder when he discounted Claimant's treating physician's opinions on same; and third, the ALJ improperly evaluated Claimant's credibility. (Document No. 9 at 5-7.) Claimant requests that she be awarded benefits or in the alternative, that this matter be remanded to correct the errors below. (<u>Id</u>. at 7.)

In response, the Commissioner contends that the ALJ properly gave little weight to Dr. Fisco's opinion, who treated Claimant in connection with her worker's compensation claim, and that the ALJ provided numerous citations from the evidence of record that belied Claimant's allegations of disabling pain and did not support Dr. Fisco's limitation that she lift no more than five or ten pounds. (Document No. 10 at 6-9.) The Commissioner points out that Claimant continued to work after she reinjured her shoulder in October 2011. (<u>Id</u>. at 6.) Moreover, the ALJ

highlighted Claimant's conservative treatment for her allegedly disabling conditions, and that said treatment was sporadic between 2013 and 2015 and that Dr. Fisco advised Claimant that she did not need to return for treatment for a year. (Id. at 7.) Dr. Fisco's own treatment notes reflect his opinion that Claimant's allegations of pain were inconsistent with his objective findings. (Id. at 7-8.) Dr. Fisco's opinions also predated Claimant's alleged onset date, only concerned her worker's compensation claim and he essentially reduced her to sedentary work on a temporary basis. (Id. at 10.)

The Commissioner reminds the Court that the ALJ was entitled to rely upon the opinion evidence provided by the State agency medical consultants and give them greater weight as they were more consistent with the record of evidence and familiar with the requirements of the Social Security disability program. (Id.) The ALJ is also the trier of fact and is solely responsible for assessing a claimant's RFC, and is not required to obtain a separate medical opinion in this determination; there was sufficient evidence from the record that supported Claimant's RFC. (Id. at 11-12.)

Further, the Commissioner argues that the ALJ complied with the Regulations in assessing Claimant's credibility because his reference to the objective medical evidence as well as her own statements concerning her activity of daily living all presented a greater functioning level than she alleged. (Id. at 8.) Claimant also sought employment during the relevant period that contradicted her allegations of total disability. (Id. at 9.) The ALJ indicated he found Claimant evasive and not very forthcoming during the administrative hearing. (Id.)

Finally, the Commissioner contends that the ALJ was not derelict in his duty to develop the record; he has discretion whether to obtain a consultative examination and the record did not

support any reason for him to do so in this case. (<u>Id</u>. at 12-13.) The Commissioner concludes that the ALJ's decision is supported by substantial evidence and requests the Court to affirm her final decision. (<u>Id</u>. at 14.)

## The Relevant Evidence of Record[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Holzer Clinic/Donald A. Fisco, D.O. Treatment Records:</u>

Claimant started treatment with Dr. Fisco on October 28, 2009 with respect to her occupational injury to her right shoulder and thoracic sprain/strain she sustained on October 27, 2007 when she slipped on ice while pulling a skid of freight. (Tr. at 491, 497.) Dr. Fisco completed a workers compensation form on October 28, 2009 indicating that Claimant could return to work that day with restrictions; he planned to treat Claimant's conditions with medication. (Tr. at 493, 499.) By letter dated November 5, 2009, Dr. Fisco requested approval from workers compensation for an MRI of Claimant's right shoulder, physical therapy on her right shoulder, cervical and thoracic regions three times per week for three weeks. (Tr. at 492, 498.)

Claimant returned to Dr. Fisco on January 6, 2010 for recheck on her cervical, thoracic and right shoulder strain. (Tr. at 317-318.) Dr. Fisco noted she participated in physical therapy, although it was halted because she was feeling lightheaded with certain positions of her neck. (Tr. at 317.) Because of paresthesias in her arm and decreased grip strength, Dr. Fisco requested a cervical MRI to determine if she sustained a cervical disc injury. (<u>Id</u>.)

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

On January 20, 2010, an MRI of Claimant's cervical spine indicated no fracture, spondylosis with spondylitic bars at the C4/C5, C5/C6 and C6/C7 levels, moderate size bulging discs at C4/C5 and C6/C7, large asymmetric bulging disc at C5/C6 more prominent on the right with slight compression of spinal cord. (Tr. at 320.) There was also mild compression of spinal cord at C6/C7 from bulging disc and spondylitic bar, mild narrowing of neural foramina at C4/C5 and moderate narrowing of the foramina at C5/C6 and C6/C7. (Tr. at 320-321.)

Claimant was sent for a consultation with Dr. Shailen K. Mehta on February 24, 2010 at Dr. Fisco's request in connection with the workers compensation claim. (Tr. at 329-330.) Dr. Mehta noted an MRI of Claimant's shoulder "showed only some mild AC joint arthritis" and the results of the cervical spine MRI. (Tr. at 329.) Dr. Mehta offered to do some epidurals as a temporary fix to reduce inflammation in order for Claimant to make further progress in therapy; Claimant wanted to see a spine surgeon for a permanent fix, although Dr. Mehta opined surgery on the C5 disc would put further stress on the discs above and below. (Tr. at 330.)

Dr. Fisco saw Claimant again on October 20, 2010 and noted that she was having a lot of problems to do anything with over the shoulder level work or with any significant lifting of her right arm. (Tr. at 355.) Accordingly, Dr. Fisco "reimposed" restrictions of no lifting over 10 pounds with the right arm and no over shoulder level work with the right arm. (Id.) Dr. Fisco saw Claimant again on January 19, 2011 and he continued to have her work with restrictions of no lifting over 5 pounds with the right arm and no over the shoulder level work with the right arm. (Tr. at 359.)

Claimant had a recheck on her cervical and thoracic strain injury with Dr. Fisco on October 12, 2011. (Tr. at 411.) Dr. Fisco noted that Claimant was still working, and that her pain was rated 8/10 because she reinjured her shoulder the previous week when a clothing rack fell on her. (Id.)

Dr. Fisco's impression was "contusion of the right shoulder exacerbating pre-existing thoracic and cervical sprain." (Id.) Dr. Fisco noted "[s]he's going to continue her present restrictions at work. She will continue her present medications. We'll see her again in a month for followup." (Id.)

Claimant returned to see Dr. Fisco on November 9, 2011 with continued complaints of discomfort in her right upper trapezius region that radiated at times into the right midthoracic area and into the right arm. (Tr. at 420.) She "did get relief when we gave her a short course of oral steroids", although "epidural steroid injections were rejected by workers comp." (Id.) Dr. Fisco noted that Claimant was "still working" with restrictions, and was going to seek approval for her to be seen by a neurosurgeon. (Id.)

Another treatment note dated December 7, 2011 indicated that Claimant was "still working" and although she was put on restricted duty at Wal-Mart, her shoulder was aggravated when subjected to cold weather. (Tr. at 422.) Dr. Fisco planned to get Claimant on physical therapy and that she continue to take Celebrex and Flexeril as needed; Claimant was going to go on medical leave for six weeks to give her shoulder a rest. (Id.) Dr. Fisco's impression was "[c]ontusion right shoulder." (Id.) Claimant continued with monthly treatment for her cervical/thoracic strain in 2012. (Tr. at 423-475.)

Claimant returned to see Dr. Mehta on February 29, 2012 for another consult at Dr. Fisco's request. (Tr. at 426-427.) Claimant reported her pain "is there 24 hours a day" and rated it 8/10 and that she had weakness in her neck, shoulder and numbness in her arm. (Tr. at 426.) She advised her pain is better with muscle relaxers. (Id.) It was noted that she can stand for unlimited periods, can sit for unlimited periods, can lift under 10 pounds and can walk over 2 miles; Claimant reported "the pain stops her for [*sic*] sewing or gardening or riding a 4-wheeler." (Id.) Physical examination

showed Claimant had full range of cervical spine motion, with guarding, negative Spurling and Tinel's tests, and intact sensation. (Tr. at 426-427.) Dr. Mehta noted "[t]he difficulty here is that the symptoms greatly outweigh objective findings" and offered injections, however Claimant was concerned she would jump the moment she felt a stick and wanted to think it over. (Tr. at 427.)

A treatment note dated June 27, 2012 indicated that Claimant saw Dr. Fisco for recheck of her neck and shoulder pain. (Tr. at 441-443.) Dr. Fisco noted that Claimant settled her workers compensation claim and decided to get the trigger point injections recommended by Dr. Mehta. (Tr. at 443.) Claimant continued to have pain in the right cervical and thoracic area although she "is hopeful that she can get back to working at Wal-Mart"; Dr. Fisco instructed her to return in a month to "see how she is doing and when we can release her for work." (Id.)

Claimant returned to Dr. Mehta on July 10, 2012 for the trigger point injections. (Tr. at 444-446.) Dr. Mehta noted "[h]er exam had shown a lot of inconsistencies" where the MRIs showed "some minor bulging and arthritis at C4-C7" and her shoulder had "mild AC joint arthritis". (Tr. at 445.) Dr. Mehta stated Claimant's exam "is again notable for her jumping and moving with just the slightest touch to her neck and shoulder. . . There is no muscle atrophy." (Tr. at 446.) Because Claimant started screaming and moving as soon as Dr. Mehta pierced the skin on her shoulder, Dr. Mehta was "not able to do any procedures on" Claimant and "suspect[ed] nonorganic factors at work." (Id.)

Claimant's next visit with Dr. Fisco was on March 6, 2013 for recheck of her cervical and thoracic strain. (Tr. at 482-484.) Claimant still endorsed discomfort to palpation of the upper trapezius and thoracic and lower cervical musculature on the right, however, Dr. Fisco noted "I don't really know much else to offer her" since she refused injections and though she wanted a

refill on the betamethasone cream, it caused her to break out and Dr. Fisco was not comfortable writing a prescription for it. (Tr. at 484.)

Claimant received sporadic treatment between 2013 and 2015. (Tr. at 478-481, 504, 505-508, 512.) A treatment note dated June 6, 2014 indicated Claimant returned to Holzer Clinic and was seen by Dr. Jennifer Olson. (Tr. at 505-509.) Claimant reported her right shoulder pain was a burning, constant pain that she rated a 5. (Tr. at 505.) Claimant was exercising regularly (Id.) and she had no stiffness in her neck. (Tr. at 506.) Dr. Olson's examination revealed unremarkable findings. (Tr. at 508.) Claimant returned to see Dr. Olson on December 10, 2014 reporting that her right shoulder pain was dull and intermittent that she rated a 7; because insurance no longer covered her topical pain relief cream, she wanted to try something else. (Tr. at 525.) A physical examination showed Claimant's neck had no crepitus, the musculoskeletal systems indicated that she had full range of motion, no crepitus, no cyanosis, clubbing, or petechiae, normal gait, motor strength 5/5 bilaterally, and no muscle atrophy noted. (Tr. at 526.) Dr. Olson noted Claimant had "minimal range of motion of right shoulder, no erythema no swelling no tenderness with palpation." (Id.) Dr. Olson offered to refer Claimant back to orthopedics regarding her chronic right shoulder pain, but Claimant "is not interested, will start oral p.r.n. anti-inflammatories." (Tr. at 529.) Claimant returned to the Holzer Clinic on December 17, 2014 with complaints of a cough and congestion; it was noted she "[m]oves all extremities well, gait intact." (Tr. at 523.)

State Agency Medical Consultants:

On July 30, 2013, at the initial level of review, A. Rafael Gomez, M.D. reviewed the evidence of record, and determined that Claimant's RFC at light exertional work and restricted her

from reaching in front and/or laterally and overhead with her right upper extremity. (Tr. at 91-93.) On August 24, 2013, Rogelio Lim, M.D. affirmed Dr. Gomez's findings. (Tr. at 100-103.)

**<u>The Administrative Hearing</u>**

<u>Claimant Testimony:</u>

Claimant testified that her past relevant work included working as a cashier and then working at the customer service desk at Krogers. (Tr. at 41-42.) The most weight she estimated she had to lift was a box of quarters, but she did not know how much that weighed. (Tr. at 43.) Claimant's next job was at a food factory plant working on assembly line and then supervising the assembly line. (Tr. at 44.) She testified that she would stand or sit half and half of the time and the maximum amount of weight she would deal with was about 25 pounds. (Tr. at 46.) She left that job because she hurt her back. (Tr. at 47.) She was out of work for about a year, looking for other work, and then found work at Wal-Mart. (Tr. at 48-49.) At Wal-Mart, she started as a cashier, was then moved into the accounting office, then moved to dairy stocking shelves, then moved into the clothing department as a sales associate, and then moved into the meat department stocking product. (Tr. at 49-53.) In November 2009, Claimant testified that she injured her right shoulder while working in the meat department trying to pull a skid of boxes of turkey out of the freezer. (Tr. at 54-55, 56.)

Claimant did not miss any time with that injury and returned to her job on light duty for about a year or two as a door greeter. (Tr. at 55.) Claimant stated that she returned to the clothing department a couple of times after that when she reinjured her shoulder in 2011. (Tr. at 57.) Claimant testified that Wal-Mart allowed her to return to work, but without restrictions, and Dr. Fisco would not release her back to that job because he did not think she should be lifting that

much weight again. (Tr. at 59.) She stated that Dr. Fisco told her she should not lift anything weighing more than five to ten pounds. (Tr. at 60.) The last position she held at Wal-Mart was as a greeter; she testified that she was told that greeters were going to be done away with and that she would have to pass a physical test if she wanted her job back because she would have to do anything that was asked of her. (Tr. at 81-82.)

Claimant testified that she is unable to work because of her shoulder and back. (Tr. at 61.) She stated that as long as she does not have to lift or put her right hand over her head or behind her back, she can turn it, twist it, get dressed and things like that. (Tr. at 62.) During the day, Claimant testified that she feeds herself, cleans around the house a little, dusts, vacuums, makes the bed and cooks with help. (Tr. at 63.) She participates in a sewing club once a month, although they do not really do any sewing; she made a quilt about three or four months prior. (Tr. at 63-64.) She cannot make quilts anymore because her arm hurts too bad. (Tr. at 64.) Claimant drives maybe once or twice a week to go grocery shopping or to go to doctor's appointments. (Tr. at 65.)

Claimant used to walk for exercise, and admitted she walked about one and a half miles last weekend, but she did not walk all winter because it irritated her lungs. (Tr. at 65-66.) She admitted that she tried looking for work, but because of her shoulder, she would not be able to perform the work duties necessary. (Tr. at 66.)

Claimant was last treated by Dr. Olson on June 6, 2014 for her shoulder; Dr. Olson advised Claimant that she did not have to return for a year. (Tr. at 67.)

Anthony Michael, Vocational Expert ("VE") Testimony:

The VE testified that Claimant's past work as a vending attendant would be classified as light and unskilled; as a cashier as light and unskilled; as a courtesy clerk in the grocery store as

light and semi-skilled; as a greeter at Wal-Mart as light and unskilled; a clothing sales associate light and semi-skilled; as a stock clerk in the dairy and meat departments as heavy and semi-skilled, and as Claimant performed them as medium; in the food manufacturer conveyor feeder as medium and unskilled and then as supervisor of food processing as light and skilled, but sedentary to light as Claimant performed it (Tr. at 70-71.); and finally, as a cash accounting clerk job sedentary and skilled, but sedentary to light as performed by Claimant. (Tr. at 76.)

The ALJ posed a hypothetical to the VE assuming an individual with Claimant's age, education and work history with the ability to lift up to 20 pounds occasionally, lift and carry up to 10 pounds frequently, stand and walk for about six hours and sit for six hours in an eight-hour workday with normal breaks, with a right dominant upper extremity limited to pushing and pulling occasionally and reaching in all other directions frequently. (Tr. at 72.) The ALJ further restricted the hypothetical individual to avoid concentrated exposure to extreme cold, extreme heat, wetness, excessive vibration, and use of moving machinery as well as unprotected heights. (Id.) The VE responded that the greeter, the clothing sales associate, the cashier position, the courtesy clerk, the supervisor of food processing, and the cash accounting clerk could still be performed generally and as performed by Claimant. (Tr. at 76-77.)

The ALJ posed a second hypothetical to where the individual was restricted to never reaching overhead and only occasional reaching in all other directions with the right dominant extremity with all other factors remaining from the first hypothetical. (Tr. at 77.) The VE testified that none of the past work could be performed with the revised restriction. (Tr. at 77-78.) However, the VE opined that with those restrictions, the individual could work as a school bus monitor, and as a lobby attendant/usher at the light level. (Tr. at 78.) Under the sedentary classification, the VE

testified that the individual could perform work as a surveillance system monitor and call out operator. (Id.)

In response to questions from Claimant's representative, the VE opined that even if the dominant right upper extremity was restricted to lifting no greater than ten pounds, the individual could still perform the two light jobs he identified. (Tr. at 79.) If the dominant right upper extremity was restricted to lifting no greater than five pounds, the VE testified that only the sedentary jobs would remain. (Tr. at 80.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As previously stated, Claimant argues the ALJ improperly discounted Dr. Fisco's opinion limiting Claimant to lifting no more than five to ten pounds, that his credibility analysis was flawed, and that he failed to fully develop the record.

Evaluating Opinion Evidence:

Pertinent to the case at bar, 20 C.F.R. § 404.1504 provides that:

> [a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

Social Security Ruling, SSR 06-3p, 71 FR 45593-03, at *45596. However, the Ruling makes clear that the "evidence used to make these decisions[] may provide insight into the individual's mental and physical impairment . . . [w]e will evaluate the opinion evidence from medical sources who have had contact with the individual in their professional capacity, used by other agencies . . . in accordance with 20 CFR 404.1527, 416.927[.]"

Section 404.1527 governs the SSA's criteria for evaluating opinion evidence; per § 404.1527(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a

whole to determine whether the Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994). The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

In this case, the ALJ gave "little weight" to the workers' compensation opinions[4] "because another program's disability determination is not dispositive in Social Security Administration cases, they are from prior to the relevant period, appear to be temporary and not permanent in nature, and the claimant worked at the light duty level subsequent to the opinions [1F/39, 1F/43, 1F]." (Tr. at 21, 355, 359.) These two specific citations in the record pertain to (1) Dr. Fisco's October 20, 2010 recommendation that Claimant not lift more than ten pounds with her right arm with no over shoulder level work with the right arm, and (2) his subsequent recommendation on January 19, 2011, that Claimant not lift more than five pounds with her right arm with no over shoulder level work with the right arm.

In reference to the factors an ALJ must consider in evaluating opinion evidence, the ALJ herein acknowledged that "[t]he longitudinal history" showed that Claimant had been treated for her right shoulder injury prior to the relevant period, in November 2009 through October 2012. (Tr. at 19-20.) The ALJ noted the cervical MRI scan in October 2010 showed degenerative changes and moderate size bulging discs C4-7. (Tr. at 19.) The ALJ specifically noted that Claimant worked after her original injury and after her subsequent injury. (<u>Id</u>.) The ALJ further noted that Claimant

---

[4] Though the ALJ did not reference Dr. Fisco by name, it is clear from the record of evidence that Dr. Fisco treated Claimant for her occupational injuries while her workers compensation claim was pending.

received monthly treatment with respect to her occupational injury through 2012, that she had full range of motion in her cervical spine in February 2012 "but with guarding", that Spurling and Tinel's tests were negative, and that despite diagnoses of cervical disc bulges and chronic shoulder strain, "treatment notes show her reported pain was 'a lot more' than her physician expected based on her MRI scan findings." (Tr. at 20.) The ALJ also acknowledged that throughout 2012, the records indicated Claimant continued to exhibit painful range of motion, trapezius spasms, right parascapular tenderness, and that she had been diagnosed with neck sprain, thoracic sprain, upper back pain that radiated to her right scapula, chronic shoulder pain, significant chronic pain behavior, however, by July 2012, treatment notes "show that her exam 'had shown a lot of inconsistencies,' despite her complaints of disuse she had no muscle atrophy, and her doctor suspected 'nonorganic factors at work' regarding her shoulder pain." (Id.)

The ALJ noted Claimant "had sporadic treatment for her shoulder between 2013 and 2015." (Id.) February and March 2013 records indicated that Claimant had marked tenderness, discomfort to palpation and that she was diagnosed with chronic cervical/thoracic strain, however, the ALJ noted that by June 6, 2014, Claimant had a generally normal physical exam, during which she admitted to exercising regularly and had no muscle aches, and she was not given any diagnosis relating to her shoulder, cervical spine, or thoracic spine. (Id.) The ALJ mentioned the treatment notes from December 10 and 17, 2014 in which Claimant exhibited no muscle atrophy, no crepitus, no swelling, a normal gait, full strength, no tenderness to palpation, and that she "moved all of her extremities well." (Id.)

From the aforementioned, though only briefly reproduced here, the ALJ's analysis and ultimate valuation of the workers compensation opinions fully complies with both the Regulations

and SSR 06-3p. Notably, no opinions contained in the record suggest Claimant was disabled from her impairments, and the inconsistencies found by Claimant's own treating physicians in the medical records further supports the ALJ's affording "little weight" to the workers compensation opinions. Moreover, though the ALJ gave "significant weight" to the opinions of the non-examining State agency medical consultant, the ALJ found they were "well supported by the medical evidence of record from the relevant period." (Tr. at 21.) Indeed, both State agency medical consultants' opinions found Claimant capable of light work, the same level she worked "subsequent to the [workers compensation] opinions." (Id.) In short, the undersigned **FINDS** the ALJ's evaluation of Dr. Fisco's opinions with respect to the limitations he found prior to Claimant's alleged onset date as well as the evidentiary weight given to the State agency medical consultants' opinions are "rational" and supported by substantial evidence. Oppenheim, 495 F.2d at 397.

Credibility Determination:

Social Security Ruling 96-7p[5] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See, also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her

---

[5] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on April 24, 2015. See, SSR 16-3p, 2016 WL 1131509.

ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In addition to the medical record evidence, including the MRI scan results, the opinions of Claimant's workers compensation doctors, the sporadic treatment with respect to Claimant's impairments, and Claimant's continued employment after her occupational injuries previously discussed *supra*, the ALJ reviewed Claimant's statements in support of her DIB claim as well as her testimony at the hearing in his credibility assessment. (Tr. at 19, 20-21.) The ALJ found Claimant's allegations "not fully credible" and gave several reasons for this determination: (1) the objective medical evidence did not support her work-related limitations; (2) she required "very little treatment for her impairments since 2012, and that in 2012, her complaints were inconsistent with objective diagnosis imaging, her exams had a lot of inconsistencies, there were suspected 'nonorganic factors at work,' and she had no atrophy despite her claims of not being able to use her right arm"; (3) Claimant admitted at the hearing she was told she did not need to see the doctor who treated her shoulder impairment for a year; and (4) Claimant did not seek treatment specifically for her shoulder for about a year. (Tr. at 21.)

Next, the ALJ explored Claimant's activities of daily living, and also found they were not consistent with totally disabling upper extremity impairments: (1) she can make her bed, "which requires reaching with the upper extremities"; (2) she can use a computer, wash dishes, care for pets, cook daily, and vacuum, "which requires pushing and pulling with the upper extremities"; (3) she can dust and launder, "which requires lifting and reaching"; (4) she can mow the grass with a riding mower twice weekly, drive, "which requires twisting the neck"; (5) she can go out alone, shop and sew for an hour daily, "which requires extensive upper body and neck movements; (6) Claimant testified she is able to grocery shop up to twice weekly, walks three to five miles for exercise, can sew a quilt in a couple of months, and "looked for work during the relevant period, which indicates she felt capable of performing work." (Id.) Significantly, the ALJ expressly noted that he "found the claimant evasive at the hearing, and not very forthcoming regarding her abilities or the reasons for her treatment gaps for her shoulder." (Id.)

The undersigned **FINDS** the ALJ gave a thorough, well-reasoned analysis in his assessment of Claimant's credibility, and that his ultimate determination that she was not fully credible complies with the pertinent Regulations, and with respect to the ALJ's finding regarding Claimant's demeanor during the administrative hearing, the ALJ's credibility analysis deserves utmost deference and is supported by substantial evidence. See Shively v. Heckler, 739 F.2d 987, 989-990 (4th Cir. 1984).

Duty to Develop the Record:

Claimant references the ALJ's comment at the administrative hearing in support of her argument that the ALJ deviated from his duty to develop the record (Document No. 9 at 6-7.): "Well, I'm not going to close the record because I've got to decide whether or not I want you to

be seen by an orthopedic doctor to do some testing on your shoulder." (Tr. at 84.) The undersigned notes that the ALJ had made several comments during the hearing about the lack of evidence from Claimant's workers compensation claim that would have provided Claimant's functional limitations with respect to her being limited to lifting no more than five to ten pounds with her right hand. (Tr. at 38, 59-60, 83.) The ALJ also found it "curious" that there was no consultative examination in this case, and the ALJ had not decided whether to order one or not. (Tr. at 83.) Claimant's representative indicated concern that a consultative examination would delay the decision and also indicated that another request to workers compensation may provide additional records. (Tr. at 83-84.)

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The Court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id. Interestingly, in the case at bar, there was no question as to whether Claimant's impairments met the requirements in the listings: "the claimant's representative conceded that the claimant did not meet a Listing at the hearing." (Tr. at 18, 38.)

It is Claimant's responsibility to prove to the Commissioner that she is disabled. 20 C.F.R. § 404.1512(a). Thus, Claimant is responsible for providing medical evidence to the Commissioner

showing that she has an impairment. Id. § 404.1512(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as a claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

An ALJ enjoys the exclusive duty as fact-finder to make an RFC assessment based on his independent analysis of the relevant evidence. 20 C.F.R. §§ 404.1545, 404.1546(c). An ALJ also enjoys discretion in obtaining a consultative examination or a subsequent consultative examination. Id. § 404.1517.

Given the ALJ's thorough review of the medical evidence of record, the concession by Claimant's representative there was no issue regarding her meeting the requirements in the Listings, and the fact that Claimant's own treating physicians' found inconsistencies between her complaints

and the objective medical findings, the undersigned **FINDS** that the ALJ neither abused his discretion by not ordering a consultative examination, nor failed in his duty to develop the record. In sum, the undersigned further **FINDS** that the ALJ's decision finding Claimant was not disabled is supported by substantial evidence.

<u>**Recommendations for Disposition**</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 9.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 10.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106

S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 13, 2017.

Omar J. Aboulhosn
United States Magistrate Judge